| NORRIS, Chief Judge.
Michael Thomas was charged by bill of information with attempted second degree murder. He proceeded to trial in which a 12-member jury returned the responsive verdict of attempted manslaughter, La. R.S. 14:27, 14:31. He was later adjudicated a third felony offender and sentenced to a mandatory life at hard labor without benefit of parole, probation or suspension of sentence. He now appeals, urging the evidence was insufficient to support a conviction of attempted manslaughter, the trial court impermissibly limited cross examination of a State witness, and the sentence is unconstitutionally excessive. For the reasons expressed, we affirm.

Factual background

Early on the morning of December 26, 1996, Shreveport police were summoned to a shooting on the street in the 1000 block of Allen Avenue. The victim, Cynthia James, was lying on the pavement with a bullet in her neck. A large crowd, described by police as “hostile,” had to be dispersed; nobody at the scene admitted seeing the shooting or knowing who the shooter was. The victim was taken to LSU Medical Center; Officer Ryan Ghol-son, who investigated the case, testified that he was unable to develop any leads from her at that time. She died roughly three weeks later; according to the coroner, this resulted from an adverse drug reaction.
Within hours of the shooting, officers developed a witness, 16-year-old Ashanti Monroe, and a possible suspect, Michael “Lil Mike” Thomas. Ms. Monroe testified that she saw the shooting from the window of a nearby apartment. She had been at H & H Lounge on Hope Street after midnight with a crowd of people including the victim, whom she knew well, and the defendant, Michael Thomas, who was “just an acquaintance.” Outside the lounge an argument erupted between Thomas and someone named Stanley. Police were called, but Thomas |2handed his gun to somebody before officers arrived, and the crowd scattered. Ms. Monroe and her group (including the victim) left, taking Stanley with them to a second story apartment belonging to Lamekia Harris in the Jackson Heights projects on Allen Avenue, about a block away.
From the window she could see Thomas and a crowd in the parking lot across the street. Thomas was holding a gun and looking for Stanley. Ms. Monroe testified she had no intention of going down into the crowd, and she kept Stanley safely inside. For reasons Ms. Monroe could not explain, the victim left the apartment, walking past the crowd and down an alley. When she returned, she had words with Thomas. Ms. Monroe, watching through the window, said the victim neither threatened nor gestured at Thomas, but he pulled a gun, turned around and shot her once; she fell immediately. Thomas stood there for a moment, then fled. Ms. Monroe phoned 911. As noted, nobody in the crowd below would identify the shooter.
Ms. Monroe maintained she had an excellent view of the incident from the second story window, a point corroborated by *613 Officer Gholson. She was positive that Thomas was the shooter: she identified him in court and in a photo lineup prepared by Officer Gholson. Thomas was arrested in the H & H Lounge on January 17.
Another witness, Jerry Hayes, testified that he was walking down Allen Avenue and was about 100 feet away when the shooting occurred. He testified that Thomas and the victim were having an argument when Thomas suddenly pulled a gun, shot her once, then walked toward Milam Street. He identified Thomas as the shooter. Hayes admitted he did not volunteer this information to the police at the time, and did not speak to officers until January or February. He also admitted four prior felony convictions, some misdemeanors, and at the time of trial was a trusty at Caddo Correctional Center. However, he denied that he was ^testifying in order to curry favor with prosecutors. In fact, he was subpoenaed to testify at Thomas’s trial.
Thomas was originally indicted for second degree murder; the District Attorney later filed an amended bill of information charging him with attempted second degree murder, R.S. 14:30.1, 14:27. Thomas proceeded to a jury trial in late April and early May 1997 and was found guilty of attempted manslaughter, R.S. 14:31, 14:27. As noted, the District Attorney filed a multiple offender bill; Thomas was adjudicated a third felony offender. As at least one of the felonies was a crime of violence he received the mandatory life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. R.S. 15:529.1 A(l)(b)(ii).
Of five assignments of error filed in the District Court, Thomas has expressly abandoned the one pertaining to jury selection. Br., 6.

Discussion: Sufficiency of the evidence

By his first two assignments Thomas urges the evidence was insufficient to support the conviction of attempted manslaughter. The argument is entirely factual. He first argues that the State’s lead witness, Ms. Monroe, initially told police that the shooter pulled the handgun out of his pants before firing at the victim, but she testified at trial that he was “swinging it around.” Next, although they agreed on how the shooting occurred, neither Ms. Monroe nor the other alleged eyewitness, Jerry Hayes, could remember what the shooter was wearing. Further, Officer Gholson spoke to two men, Bryant and Collins, who had not witnessed the incident but gave descriptions of the person they thought was involved; after the defendant was in custody, officers made no effort to contact these potential witnesses or show them the lineup. These circumstances, Thomas argues, cast serious doubt on the credibility of the State’s witnesses, who had “ample time, particularly for Mr. Hayes, to learn what the story was and to stick to it.” He finally contends that by allowing other witnesses to remain “conveniently Delusive,” the police failed to “obtain information which might indicate that Ms. Monroe and Mr. Hayes were not being truthful.”
When the defendant challenges both sufficiency of the evidence and one or more trial errors, the reviewing court will first consider the former, as a finding of insufficient evidence will moot the trial errors. State v. Hearold, 603 So.2d 731 (La.1992); State v. Adams, 30,815 (La. App. 2 Cir. 6/24/98), 715 So.2d 118, unit denied 98-2031 (La.3/19/99), 739 So.2d 774. The Constitutional standard of appellate review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); La.C.Cr.P. art. 821. The Jackson standard, however, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), *614 680 So.2d 1165. The appellate court does not assess credibility or re-weigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient to support the requisite factual finding. State v. Braswell, 605 So.2d 702 (La.App. 2 Cir.1992), and citations therein; State v. Gradick, 29,231 (La.App. 2 Cir. 1/22/97), 687 So.2d 1071. Positive identification by one witness may be sufficient to support the conviction. State v. White, 28,095 (La. App. 2 Cir. 5/8/96), 674 So.2d 1018, writ denied 96-1459 (La.11/15/96), 682 So.2d 760.
The thrust of Thomas’s argument is that the State’s lead witness, Ms. Monroe, was simply not worthy of belief. The jury obviously accepted her account of the shooting and identification of Thomas as the shooter. We have closely examined her testimony and find that the alleged inconsistencies — -how the shooter carried the gun before the shooting, and Ms. Monroe’s inability to recall | fithe shooter’s clothing' — do not rise to a level that will warrant disturbing the jury’s credibility call. See, State v. Adams, supra; State v. Hubbard, 30,604 (La.App. 2 Cir. 4/8/98), 711 So.2d 393. Although Thomas has not challenged any particular element of the offense of conviction, attempted manslaughter, we note that the evidence supports the verdict. Ms. Monroe knew Thomas as an acquaintance and identified him; this negates any reasonable probability of misidentification. State v. Powell, 27,959 (La.App. 2 Cir. 4/12/96), 677 So.2d 1008 (on rehearing), writ denied 96-1807 (La.2/21/97), 688 So.2d 520. She saw him wielding a gun, both outside H & H Lounge and a block away on Allen Avenue. From her window vantage point she saw him exchange angry words with Cynthia James, pull the gun, point it at her and shoot. This will support the finding of a specific intent to kill the victim. State v. Arnold, 30,282 (La.App. 2 Cir. 1/21/98), 706 So.2d 578, and citations therein. Thus a rational trier of fact could find every essential element of attempted manslaughter.[1]
Finally, we find no merit in Thomas’s suggestion that an incomplete or inferior police investigation casts doubt on the evidence presented. Officer Gholson franWy admitted that two potential witnesses, Bryant and Collins, gave inconsistent descriptions of a man they thought was involved in the crime, and were not further consulted after Ms. Monroe identified Thomas as the culprit. Gholson also testified that neither Bryant nor Collins saw or heard the shooting; thus the jury was entitled to find that further work with these witnesses was not warranted. In sum, the general claim that the officers may have conducted a poor | ¿investigation and found the wrong suspect is not supported by the record.[2] See, State v. Hubbard, supra. These assignments lack merit.

Limitation of cross examination

By his fourth assignment Thomas urges the District Court erred in limiting *615 his cross examination of Jerry Hayes to determine bias, prejudice, interest or corruption. He concedes that as a general rule, only prior convictions are relevant to impeach a witness’s credibility. La. C.E. art. 611 B. He argues, however, that greater latitude is allowed when necessary to expose the witness’s motivation in testifying. La. C.E. art. 607 D(l); State v. Nash, 475 So.2d 752 (La.1985). Specifically, he contends that he was not permitted to show that Hayes would be facing a life sentence but for his cooperation and testimony against Thomas. See, State v. Bennett, 550 So.2d 201 (La.App. 3 Cir.1989), writ denied 554 So.2d 1236 (1990).
Due process affords the defendant the right of full confrontation and cross examination of the State’s witnesses. U.S. Const, amend. 6; La. Const, art. 1 § 16; Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); State v. Van Winkle, 94-0947 (La.6/30/95), 658 So.2d 198. Full cross examination includes the opportunity to demonstrate any bias or self-interest which is attached to a witness’s testimony. Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); State v. Rankin, 465 So.2d 679 (La.1985). Evidentiary rules may not supersede this fundamental right. State v. Van Winkle, supra. Except as otherwise provided by legislation, extrinsic evidence to show a witness’s bias, interest, corruption, or defect of 17capacity is admissible to attack the credibility of the witness. La. C.E. art. 607 D(1); State v. Grace, 94-295 (La.App. 5 Cir. 9/27/94), 643 So.2d 1306.
The State’s witness, Hayes, was in jail on unrelated charges at the time of his testimony; he appeared in court wearing a yellow prison jumpsuit. On direct examination he admitted four prior felony convictions, two of which occurred on the same date in 1989. On cross examination, defense counsel asked Hayes about his possible fourth-felony offender status and whether he “hoped to gain something” by testifying, “some leniency.” Hayes replied he was only in jail “for buying a truck,” a felony charge. Counsel asked if being convicted on that charge could get him life in prison, and the prosecutor objected. After a bench conference, counsel pursued a different line of questioning. Later, on redirect, Hayes testified that he first spoke to officers about the shooting incident before he was arrested on the pending felony. He added that he had been offered nothing in exchange for his testimony, including leniency. R.pp. 589-590.
Defense counsel referred to, but did not introduce, a letter allegedly written by Hayes, in which he identified 14 drug dealers and asked for help in his own case. R.pp. 567-569. Counsel did not pursue the matter further. The jurisprudence has discussed alternative means of demonstrating a plea bargain or promise of leniency that might influence a witness’s testimony. See, e.g., State v. Franks, 363 So.2d 518 (La.1978) (calling the prosecutor to admit or deny that the witness might receive favorable treatment); State v. Smith, 591 So.2d 1219 (La.App. 4 Cir. 1991), writ denied 604 So.2d 995 (La.1992) (motion in limine, heard outside the jury’s presence, to show existence of plea agreement). Hayes flatly denied receiving any leniency for testifying against Thomas, and there is no contrary evidence; this distinguishes the instant case from State v. Bennett, supra, cited by Thomas in brief. On this record, we cannot say the District Court erred in sustaining the State’s objection.
| sRather, the record shows that Hayes’s long felony record was explored both by State and defense, and there was no evidence of any plea bargain. The suggestion that he might “gain something” by testifying against Thomas was entirely speculative, and the jury could gauge whether the prospect of leniency tainted his testimony. State v. Grace, supra; State v. Dugar, 93-718 (La.App. 3 Cir. 10/5/94), 643 So.2d 870, writ denied 94-2712 (La.6/30/95), 657 So.2d 1019.
*616 Moreover, even if Hayes’s testimony was tainted, any error was harmless beyond a reasonable doubt. The jury had sufficient evidence in the testimony of Ms. Monroe and the police officers to find Thomas guilty of attempted manslaughter. La.C.Cr.P. art. 841; State v. Rankin, supra; State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364. This assignment lacks merit.

Excessive sentence

By his fifth assignment Thomas urges the sentence imposed was unconstitutionally harsh and excessive. He concedes that R.S. 15:529.1 literally requires a life sentence at hard labor without benefit for a third felony offender with one crime of violence. However, he contends that even when there is mandatory minimum sentence, the court still has' discretion to impose a lesser sentence if the facts and circumstances warrant it. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672. He argues that the District Court did not order a presentence investigation report or state for the record any factual basis for sentence as required by La. C.Cr.P. art. 894.1. He therefore requests a remand for resentencing.
The Habitual Offender law, R.S. 15:529.1, has been held to be constitutional in its entirety; the mandatory minimum sentences provided therein are therefore presumed to be constitutional. State v. Johnson, supra. The sentencing court may deviate downward only when it finds that the mandatory minimum makes no measurable contribution to acceptable goals of punishment, or [9is nothing more than purposeful imposition of pain and suffering and is grossly out of proportion to the severity of the crime. State v. Dorthey, supra. The defendant bears the burden of showing that a deviation beneath the mandatory minimum is warranted. State v. Johnson, supra, p. 8, 709 So.2d at 676.
The District Court stated that the maximum sentence for the crime of conviction, attempted manslaughter, is 20 years at hard labor. The court also noted that the instant conviction and both of his prior felonies — simple robbery and armed robbery — are defined as “crimes of violence” under R.S. 14:2(13), thus activating the mandatory life at hard labor provision of R.S. 15:529.1 A(l)(b)(ii).
To rebut the presumption, defense counsel argued that attempted manslaughter is not considered a “crime of violence” under the habitual offender statute. However, subsection 529.1 A(l)(b)(ii) prescribes mandatory life without benefit “if the third felony or either of the two prior felonies is a felony defined as a crime of violence under R.S. 14:2(13).” Section 2(13) states, in part, “The following enumerated offenses and attempts to commit any of them are included as ‘crimes of violence’: * * * (d) Manslaughter” (emphasis added in both quotes).
Counsel further argued that the proximate cause of the victim’s death was not the shooting but poor medical treatment at LSU-MC, and that according to police follow-up reports, one witness stated that the victim attacked Thomas before he shot her.[3] Even if these assertions were factual, they do not alter the fact that Thomas pulled a gun on someone in front of a lounge, left when police were summoned, walked a block away, again pulled the gun and senselessly shot Ms. James in the middle of a crowd. Thomas has a substantial record of violent criminal conduct, including charges of violent crimes that were dismissed in |inexchange for guilty pleas to his two prior felonies. He has not led a *617 crime free life, and poses a tangible threat to society. Life at hard labor and without benefit, for this offense and offender, does not shock our sense of justice. The assignment of error lacks merit.

Conclusion

We have reviewed the entire record and find nothing we consider to be error patent. La.C.Cr.P. art. 920(2). For the reasons expressed, the conviction and sentence are affirmed.
AFFIRMED.

. In pertinent part, La. R.S. 14:31 defines manslaughter as a homicide which would be murder but "the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection.” R.S. 14:27 defines attempt, in part, as "having a specific intent to commit a crime,” the defendant "does or omits an act for the purpose of and tending directly toward the accomplishing of its object.”

. Narrative supplements filed in response to discovery, but not admitted in evidence, show that Officer Gholson interviewed Bryant and Collins shortly after the shooting; neither actually witnessed it. Collins was interviewed again in February and still had no information. Officers also talked to Shelia Freeman and Ceola Nunn, Thomas’s girlfriend and mother; both of these made incriminating comments about Thomas’s conduct on the morning of the shooting. The supplements also show that Gholson interviewed the victim in her hospital bed before her death; she positively identified Thomas as her assailant. R.p. 40.

. A narrative supplement filed in response to discovery states that on April 2, over three months after the incident, a woman named Willie O’Neal told an officer that the victim "pushed” Thomas before he shot her. Cun-ously, this is the same witness who told Officer Poindexter, only hours after the incident, that she "did not witness the shooting.” R.pp. 130, 36.